Fecteau, J.
This is an action under the provisions of G.L.c. 176D, and c. 93A, in which the plaintiff alleges that the defendant insurer committed unfair and deceptive acts or practices in the manner in which it conducted its investigation, evaluation and negotiation of the underlying motor vehicle accident which had resulted in a personal injury having been caused to the plaintiff by its insured. The underlying claim for personal injury having been closed by the execution of a release and the litigation against the defendant’s insured having been closed by a stipulation of dismissal, this cause of action, the subject of an amendment to the original complaint for personal injury, comes for trial before the court on June 10, 1996, sitting without jury, having reserved the case on a nonjury basis by ruling on June 6, 1996.
Upon consideration of all the credible evidence, the court makes the following findings of fact and rulings of law.
FINDINGS OF FACT
1. The plaintiff, Cynthia Falvo (“Falvo”), was injured in a motor vehicle accident on September 1, 1990, in Marlboro, Massachusetts, when the car in which she was occupying as a passenger was rear-ended by an intoxicated driver, Richard Butts, an insured under a policy of motor vehicle liability insurance with the defendant Safety Insurance Company (“Safety”).
2. Safety was first notified of this claim for personal injuries on or about September 12, 1990, when it received a letter of representation from Falvo’s attorney, JohnF. Keenan (“Keenan”). (Ex. 1, 2.) It acknowledged receipt of this letter by letter dated September 13, 1990. (Ex. 3.) Although it had not made verbal contact with its insured by this time, an entry was made on its computer status program that liability was clear. (Ex. 1.) This entry was repeated on September 19, 1990.
3. The next contact of significance between Keenan and Safety occurred on January 23, 1991, at which time a telephone conversation took place and a confirmatory note was sent by the Safety claim representative. (Ex. 4, 5.) As a result, Keenan sent a letter dated January 24, 1991, in which he listed medical bills incurred to date by Falvo of which he was aware, which totalled approximately $4,000.00. He also enclosed copies of a report of Falvo’s treating neurologist, Dr. Naren Sodha dated October 8, 1990, and a report from Somerset Diagnostic Center indicating that a magnetic resonance imaging (MRI) study was performed on October 4, 1990. (Ex. 6.) Although Keenan believed that he enclosed copies of the medical bills referred to in his letter and that it would have been his practice to do so, the claim representative stated that she did not receive them. As Keenan’s handwritten notation *667 on the telephone message note from Safety’s telephone call of January 23, 1991, indicates “list bills and cc MRI + Dr. Sodha’s notes” (Ex. 4), I find that the copies of bills probably were not sent, but that Dr. Sodha’s handwritten office notes and the MRI report were sent. Thus, Safety was on notice of the possibility of disc involvement with radiation symptomology into the left shoulder and arm as well as of the scar injury she sustained over the left eye with supra-orbital nerve involvement. Safety received this letter with these enclosures on January 25, 1991. There were no calls or letters from Safety to Keenan requesting copies of bills not sent with this letter nor was his attention invited to this apparent oversight, if indeed it was.
4. Dr. Sodha’s report also noted a childhood accident whereby the plaintiff reportedly “fell down a flight of stairs and was ‘paralysed’ for one day.. . recovered 100% wore a back brace for one mo. had ‘neck spasm’ for 10 years and this completely resolved.”
5. For the next six and one-half months, neither parly initiated contact with the other. The next contact between the parties was Keenan’s letter to Safety, dated August 20, 1991, which enclosed a follow-up note of Dr. Sodha dated July 22, 1991. (Ex. 7.) Safety received this on August 21, 1991. He reported that the plaintiff stated that she had experienced “no material change since January 1991.” Good days and bad days were noted including a reference to “pain on the left side of the neck which spread to the left shoulder and radiates down the left upper arm up to the elbow,” sometimes with a “tingling numbness in the left hand.” He found diminished pin prick sensation in the first four digits of the left hand and mild decrease in the range of movement at the neck. Also noted was the plaintiffs unwillingness to use a TENS unit due to her work and her time constraints, and a willingness to learn to live with her discomfort.
6. The next contact between the parties occurred three and one-half months later when Safety called Keenan seeking a status as to the plaintiffs injuries and treatment, as well as for complete medical documentation, followed-up by a note to Keenan confirming its request. (Ex. 1, 27.) Keenan wrote to Safety by letter dated December 9, 1991, enclosing a report from the plaintiffs plastic surgeon, Dr. Ekstrom, dated September 18, 1991, and another copy of Dr. Sodha’s report dated July 22, 1991, which he had already sent them. (Ex. 8.) Keenan noted in his cover letter that his client has a “protuding disc which continues to cause symptoms”; additionally it should be noted that this letter refers to the medical expenses that he had “outlined” in his January 24, 1991, letter. Dr. Ekstrom’s report makes reference to a history as given by the plaintiff including being “hit by a drunk driver and suffering a cervical spine injury with a disk herniated in her neck (cared for by Dr. Sodha).” Safety received this December 4, 1991, letter with enclosures on December 10, 1991. However, this is not noted in the claim representative’s “note pad” entries. What is noted is that on February 13, 1992, there was a telephone call from Safety to Keenan looking for the plastic surgeon’s report; in addition, there is noted a December 5, 1991, telephone conversation wherein Keenan had advised that he was still waiting for the report from the plastic surgeon. I do not credit this February 13, 1992, entry, as I infer and so find that if such a call took place, that Keenan would have referred Safety to his December 9, 1991, letter.
7. Also not noted on the claims examiner’s “note pad,” nor recalled by the claims examiner was Keenan’s demand letter of February 18, 1992, in which he enclosed a photo of the plaintiffs face and made a settlement demand of $225,000.00, based on the plaintiffs permanent disfiguring scar and a ruptured cervical disc and a life expectancy of 45.4 years. He also made a demand under the newly-effective legislation for insurance policy coverage limits. (Ex. 9.)
8. On April 6, 1992, Keenan sent a demand letter to Safety under the provisions of G.L.c. 93A and G.L.c. 176D, §3 for its failure to effectuate a prompt settlement where liability had become reasonably clear. This letter was received by Safety and responded to on April 23, 1992. (Ex. 10, 11.) In his demand letter, Keenan made reference to his earlier demand letter of February 18, 1992, and in their response, Safety advised him that they had not received this letter. Safety disclosed their bodily injury coverage limits of $100,000.00 per claimant $300,000.00 per accident. Also noted in this response and for the first time in writing to Keenan is the observation that his January 24, 1991, letter did not enclose copies of bills, although acknowledging that the letter referred to $3,533.00 in bills incurred. Safety acknowledged the 2 cm. laceration to the left middle eyebrow with no need of any surgical intervention, $2,101.00 in documented medical bills as reported to them by the insurer covering the PIP claim, a small disc protrusion of C6-7 with no disability indicated by her treating physician, and no documented loss of earnings. Safety thereupon made an offer of $4,000.00 abased upon the documents [which Keenan had] presented for [their] review." I find that this was a mischaracterization of the documents which Keenan had presented for their review, inasmuch as they failed to acknowledge the apparent symptomology of the neck injury which the treating physician had reported, especially considering that the examiner’s own “request for authorization” form had noted “cervical radiculopathy” but apparently dismissed it as “exascerbation of preexisting problem” (Ex. 31), as well as having either overlooked or dismissed a reported supra-orbital nerve injury at the location of the facial laceration. I find that at the time of this first offer, Safety had not requested a medical examination of the plaintiff and not arranged for a physician to view the MRI films; *668 neither had it requested an opportunity to personally view the scar.
9. On or about April 30, 1992, Keenan commenced a lawsuit to enforce the liability of Safety’s insured and mailed to Safety a “courtesy copy” of the complaint; he suggested to them in a “P.S.” that he also intended to enter a separate action against it for failure to effectuate a prompt and reasonable settlement where liability is reasonably clear. (Ex. 12.) Safety received this copy on April 30, 1992.
10. On May 5, 1992, the Safety claim representative sent a letter to Keenan asking for “all pertinent medical documentation . . . [and his] permission to obtain pictures of your client’s scars.” (Ex. 13.) This was answered by Keenan with his letter dated May 11, 1992, in which he enclosed copies of the bills listed, as well as copies of medical reports and records, and a copy of a photograph showing scarring of his client on her forehead. (Ex. 14.) Safety received this packet of information on May 15, 1992.
11. On May 26, 1992, the handling of the claim file had to be reassigned to another claim representative due to the first examiner having left Safety. This new examiner’s first action on this file appears on June 30, 1992, when she noted in a computer entry that the file had been reassigned to her, that Keenan had apparently told his client’s medical providers not to cooperate with “record-keeper depositions” without court order (see Ex. 31), and that “there is something that [Keenan] is trying to keep from us regarding his client’s preexisting medical history.” (Ex. 1.) In another entry made minutes afterward, she states “I am going to wait and see what turns up — we have not rec’d the plaintiffs answers to interrogatories — so it is unclear what she is alleging... with additional documentation there appears that there might be some room to move.” This examiner wrote to Keenan on July 1, 1992, advising of her assignment and that as soon as she completes her review of the file, she will contact him. (Ex. 15.)
12. After a couple of unsuccessful attempts to reach Keenan by phone, the examiner was able to discuss the case with him on August 13, 1992, wherein the prior offer was increased to $9,500.00. This discussion is reported in the examiner’s note pad and it deteriorated over the significance of the “pre-existing injuries.” The examiner noted further that “possibly we will need, as soon as we are able to get all of the medical documentation, a record review. It appears that her injuries may be related to degenerative changes and not trauma.” I find that this reference relates to the information reported in the first reports which Keenan provided to Safety by his letter of January 24, 1991, that of Dr. Sodha’s office notes dated October 8, 1990, and the MRI report dated October 4, 1990, wherein the childhood fall was reported along with neck spasms, and a comparison MRI which had been done in 1989 and compared with that postacci-dent, indicating degenerative changes.
13. This telephone conversation was followed-up that same day by a letter from Safety's representative, in which the increased offer of $9,500.00, is restated, and their basis for it is explained as the minimal documentation, no documentation of disability or prognosis, the fact that the photo he sent of Falvo’s scar is “undated,” but if these concerns are satisfied, the file will be reviewed ágain. (Ex. 16.) I find that there had not yet been any medical examination performed or arranged by Safety, no review of medical records or films and no personal viewing of her scar. On September 11, 1992, the examiner again wrote asking for the documentation referred to in her last letter. (Ex. 17.) This was, in turn, answered by Keenan’s letter dated September 16, 1992, in which he invited the examiner to look at her file and his previous letters and now the discovery responses which he had filed in the underlying personal injury suit. He stated his belief that there were no other documents and those provided should be enough to base a more realistic offer. (Ex. 18.) Safety received this on September 17,1992, and the claims representative noted receipt of this letter on September 18, 1992. On September 17, 1992, it was noted by the examiner that she had received the plaintiffs husband’s answers to interrogatories and that the plaintiffs attorney had not readily provided them with documentation. No further action was initiated.
14. The next event of consequence was an entry on November 18, 1992, by the examiner that she had received a copy of the plaintiffs answers to interrogatories and “they are very basic.” (Ex. 1.)
15. A letter dated November 23, 1992, sent by Keenan to the defense counsel assigned by Safety to defend its insured, initiated discussions relative to nonbinding mediation and the next several months were involved with agreeing to the neutral. (Ex. 19.) A claim examiner’s note was entered on February 19, 1993, indicating that they were waiting for additional medical material and that they were “considering having the records/films reviewed for causality.” She saw little point in increasing their offer. (Ex. 1.) A supervisor’s memorandum dated May 4, 1993, noted that they should seek counsel’s permission for a personal view of the scar “for a proper evaluation of her scarring . . . [and that] it may be of benefit to secure the MRI films (preaccident 2/27/89 and postaccident) for an independent review of degenerative vs. traumatic nature of the objective findings.” (Ex. 30.)
16. Depositions of both the plaintiff and of Safety’s insured were conducted in early May 1993, shortly before the mediation session. The mediation session with Attorney Roger Brunelle, having been agreed to by both parties thereto as the neutral, was held on May 7, 1993. Keenan was present with his clients, Mr. and Mrs. Falvo, and the defense counsel for Safety’s insured was present. No representative from Safety was present in person. A written agreement was signed *669 by all persons present. (Ex. 20.) The mediation was not successful. Keenan followed-up on this mediation with a second c. 93A demand letter, dated May 12, 1993. (Ex. 21.) This was answered by letter dated May 26, 1993, in which the prior medical history of possible degenerative changes was repeated, that the disc protrusion appears to be minimal with no nerve compression to be caused, that they were now getting the films reviewed, and the photo of scarring which they had received being inadequate to judge its present appearance, necessitating an “in-person” viewing. Nonetheless, the offer was increased to $25,000.00. (Ex. 22.)
17. Keenan acknowledged receipt of this letter by his letter dated June 2, 1993, in which he demanded a copy of the report of the MRI film review. (Ex. 24.) Safety answered this demand by letter dated June 21,1993, by declining to produce such a copy as it was not required by statute. In addition, the claim representative increased her offer, upon her having reviewed her file, to $32,000.00. (Ex. 25.) This was based, at least in part, upon her having obtained a report from the review of the MRI films in which Dr. Mukai gave the opinion that the postaccident films of the plaintiff, when compared with those preaccident, confirmed a traumatic cause rather than a degenerative one which would be consistent with the plaintiffs examiners.
18. A pretrial conciliation conference in July 1993, at the courthouse did not succeed in resolving the case. A November 1993 trial date was assigned. The case settled on the eve of trial for $60,000.00. A release of claim was executed in favor of Safety’s insured and a stipulation of dismissal was filed, expressly excepting the newly-added claim against the defendant herein. (Ex. 26.) I find that there was no information in Safety’s file in November, 1993, which was not present in June, 1993.1 find that the only factor which was significant to Safety’s increase in offers from $9,500.00, to $60,000.00, was its receipt of the independent medical review of the MRI films of the plaintiff. I find that this review could have occurred at any time following Safety’s receipt of the MRI report which Keenan provided them with on January 24, 1991.
RULINGS OF LAW
1. Safety is subject to G.L.c. 93A and G.L.c. 176D, §3(9) with respect to the plaintiffs claims, because it was engaged in the business of insurance. G.L.c. 176D, §l(a); G.L.c. 93A, §9(1).
2. G.L.c. 93A, §9(1) provides in relevant part: “. . . any person whose rights are affected by another person violating the provisions of clause (9) of section three of chapter one hundred and seventy-six D may bring an action in the superior court. . . for damages and such equitable relief, including an injunction, as the court deems to be necessary and proper.”
3. Pursuant to G.L.c. 176D, §3(9)(f), an insurance company’s failure to “effectuate prompt, fair and equitable settlements of claims in which liability has become reasonably clear” constitutes an unfair settlement practice. G.L.c. 176D, §3(9)(f).
4. The legal issue presented is whether Safety failed to act promptly upon communications with respect to claims arising under an insurance policy, failed to adopt and implement reasonable standards for the prompt investigation of insurance claims, and failed to effectuate a prompt, fair and equitable settlement of a claim in which liability had become reasonably dear, thereby engaging in unfair settlement practices as defined by G.L.c. 176D, §§3(9)(b),(c) & (f).
5. “An absence of good faith and the presence of extortionate tactics generally characterize the basis for a c. 93A-176D action based on unfair settlement practice.” Guity v. Commerce Ins. Co., 36 Mass.App.Ct. 339, 344 (1994).
6. “Whether the defendant’s settlement proposal was an unreasonable refusal or made in bad faith was a question of fact. The defendants bore the burden of proving that their settlement offer was reasonable and made in good faith in light of the demand and attendant circumstances. This determination required proof that the defendants did not act deliberately to derail the settlement process. Otherwise stated, a wrongdoer ‘ought not wear out the claimant by unduly delaying settlement,’ when liabiliiy, including causation and damages, is clear or highly likely.” Parker v. D’Avolio, 40 Mass.App.Ct. 394, 395-96 (1996) (citations omitted).
7. An insurer is not held to standards of omniscience or perfection; it has leeway to use and should consistently employ its honest business judgment. Peckham v. Continental Casualty, 895 F.2d 830, 835 (1st Cir. 1990).
8. In construing G.L.c. 176D, §3, the Court of Appeals for the First Circuit noted that:
Negotiating a settlement, particularly when the damages are unliquidated, is, to an extent, a legitimate bargaining process. The statute does not call for defendant’s final offer, but only one within the scope of reasonableness . . . The reasonableness of a defendant’s response is to be considered in light of the situation as a whole, one aspect of which was the size of plaintiffs demand. Plaintiffs demand was very high. Ordinary give and take would suggest that both would and should move.
Forcucci v. United States Fidelity & Guar. Co., 11 F.3d 1, 2 (1st Cir. 1993).
9. Recovery may be had under G.L.c. 93A, §2 for a negligent act that results in a deceptive or unfair act. Swanson v. Bankers Life Co., 389 Mass. 345, 349 (1983). Factors to consider in determining whether an act or practice is unfair include what a defendant knew or should have known, the plaintiffs conduct and knowledge and what she reasonably should have known. Id.
10. Safely argues that its settlement offer of $4,000 made on April 23, 1992, in response to Falvo’s G.L.c. *670 93A demand letter dated April 6, 1992, was reasonable based upon the documents it claims to have received, which were enclosed in Falvo’s letter dated January 24, 1991. The information available to Safety at this time included a reference to $3,533.00 in bills incurred by the plaintiff, a photograph of the plaintiffs facial scar, Dr. Sodha’s notes dated October 8, 1990, regarding the injury to the area over the plaintiffs left eye, and an MRI report dated October 4, 1990 indicating degenerative changes to the plaintiffs cervical disc. In the fifteen months prior to making this settlement offer, Safety did not request or arrange for a physician to view the plaintiffs scar, perform a medical examination, or review the MRI report.
12. This same information regarding Falvo’s injuries and expenses was available on August 13, 1992 when Safety increased its settlement offer to $9,500.00. Safety had not requested a medical examination or independent review of the MRI films prior to making this offer.
13. By letter dated May 26, 1993, Safety increased its settlement offer to $25,000.00, despite information that the plaintiffs disc protrusion was caused by degenerative changes rather than the trauma of the accident, and after insisting that an in-person viewing of the plaintiffs scar was necessary.
14. By letter dated June 21, 1993, Safety increased its settlement offer to $32,000.00 based in part on Dr. Mukai’s report in which he opined that the plaintiffs injuries were caused by trauma and were not degenerative. This new information, however, could have reasonably been discovered at an earlier date.
15. Where, as here, the plaintiff sent documentation as to her physical injuries and medical bills as early as January 24, 1991, and sent a demand letter on April 6, 1992, Safety had sufficient time to arrange for an in-person view of the plaintiffs facial scar and independent review of the MRI films prior to making its offer on April 23, 1992. Thus, Safety acted unreasonably in waiting until approximately May 12, 1993 to order an independent review of the MRI films and acted unreasonably in waiting until June 21, 1993 to offer $32,000.00.
16. The court finds that Safety failed to maintain standards for a prompt and reasonable investigation, and as a result failed to effectuate a reasonable settlement. It thereby violated G.L.c. 176D, §3 and G.L.c. 93A, §9.
17. G.L.c. 93A, §9(3) states:
[I]f the court finds for the petitioner, recovery shall be in the amount of actual damages or twenty-five dollars, whichever is greater; or up to three but not less than two times such amount if the court finds that the use or employment of the act or practice was a willful or knowing violation of said section two or that the refusal to grant relief upon demand was made in bad faith with knowledge or reason to know that the act or practice complained of violated said section two. For the purposes of this chapter, the amount of actual damages to be multiplied by the court shall be the amount of the judgment on all claims arising out of the same and underlying transaction or occurrence, regardless of the existence or nonexistence of insurance coverage available in payment of the claim.
18. Single damages under G.L.c. 93A are designed to compensate for losses which were the foreseeable consequences of the defendant’s unfair or deceptive act or practice. Bertassi v. Allstate Ins. Co., 402 Mass. 366, 372 (1988). The foreseeable loss sustained from an insurance company’s unfair settlement practice is the loss of the use of money to which the plaintiff was entitled. Id. The damages from this loss are the interest that would have been earned from this money between the time the money should have been paid and when it was actually paid. Id. at 372-73.
19. Plaintiffs damages are the interest she would have earned on a damage award for her underlying claim between the time that Safety should have tendered a settlement and the time she actually received the settlement. The court finds that Safety should have made a reasonable offer of settlement in April 1992, which would have afforded the defendant approximately fifteen months to review the plaintiffs submitted materials and arrange for an independent physical examination of the plaintiff and her MRI report. The court further finds that plaintiff received a fair settlement from Safety in November 1993, in the amount of $60,000.00. Therefore, applying the judgment interest rate of 12 percent for a period of 19 months to the amount of $60,000.00, pursuant to G.L.c. 231, §6B, the Court finds that plaintiffs actual damages from Safety’s violation of G.L.c. 93A were $11,400.00.
20. “A negligent unfair act or practice does not. qualify for multiple damages [under G.L.c. 93A].” Squeri v. McCarrick, 32 Mass.App.Ct. 203, 208 (1992) (quoting Wang Labs., Inc. v. Business Incentives, Inc., 398 Mass. 854, 858 (1986)). The court concludes that Safety’s failure to promptly investigate and make a reasonable settlement offer was negligent, and did not rise to the level of a willful or knowing violation of the statute. Therefore, the court declines to award multiple damages under G.L.c. 93A and declines to award punitive damages under G.L.c. 176D, §7.
21. The court further orders that attorneys fees and costs incurred in connection with this action be awarded to plaintiff, pursuant to G.L.c. 93A, §9(4). As the parties did not provide evidence on this issue, a further hearing shall be held to determine the amount of costs and reasonable attorneys fees.
ORDER
For the foregoing reasons, it is hereby ORDERED that Safety Insurance Company pay to Cynthia Falvo damages in the amount of $11,400.00 plus costs and attorneys fees in an amount to be determined.