McDonough, Edward J., J.
Plaintiff Katie Graf (“Graf j alleges defendant Hospitality Mutual Insurance Company (“Hospitality”) committed unfair insurance claims settlement practices, in violation of G.L.c. 93A, §§2 and 9 and G.L.c. 176D, §3(9). Graf alleged that she sustained serious and permanent damage and disability as the result of a fractured ankle she sustained on September 7, 2007, at The Fat Cat Bar and Grill (“Fat Cat”) in Springfield, Massachusetts.
BACKGROUND
Graf claims Hospitality violated c. 176D, §3(9)(f) when it failed to effectuate a prompt, fair and equitable *14 settlement of her tort claim despite the fact that liability had become reasonably clear to Hospitality before and after a February 1, 2010 jury verdict in her favor in the amount of $500,000, the amount of Hospitality’s policy limits.
On the incident date, the Fat Cat was insured by Hospitality’s predecessor insurer, the Liquor Liability Joint Underwriting Insurance Association of Massachusetts (“LLJUA”) under a policy of liability insurance effective from February 3, 2007 to February 3, 2008, with liability limits of $500,000. Hospitality became successor in interest and obligation to LLJUA in June 2008.
Up to the February 1, 2010 verdict, Graf submits Hospitality never made any offer of settlement to Graf, nor did Hospitality make an offer post-verdict until July 16, 2010—more than five months post-verdict— when Hospitality offered to pay Graf the sum “of $500,000 plus postjudgment interest through an agreed upon date ... in exchange for a release of the defendants [in the Litigation] to the satisfaction of counsel for the defendants.”
Hospitality denies it violated c. 176D claiming it conducted a reasonable investigation of Grafs claim beginning shortly after it received notice of her claim. Hospitality submits its investigation, as well as its experienced and skilled trial counsel’s pretrial discovery, disclosed the case was entirely a credibility contest as to how the incident occurred between Graf and her friend eyewitness, and the competing version told by Hospitality’s insured bar manager and bouncer.
Hospitality’s position is that before and after the February 1, 2010 verdict, Hospitality reasonably believed in the truth of its insured’s employees’ statements—including their deposition and trial testimony—and that grave doubts existed about Grafs implausible account based on common sense and Grafs self-contradictions. Hospitality submits that notwithstanding the verdict for Graf, liability still was not reasonably clear because Hospitality had good faith, non-frivolous grounds for appeal, and was so advised by its trial counsel, Attorney Kathleen Sheehan and its post-trial counsel, Attorney John P. Ryan. In particular Hospitality believed in good faith, and had been so advised by legal counsel, that the trial judge committed reversible error on a critical eviden-tiaiy ruling going to the hotly disputed question of why the Fat Cat staff never called an ambulance for the injured Graf, thereby enhancing Grafs credibility, harming the Fat Cat employees’ credibility, and depriving Hospitality’s insureds of a fair trial in what was quintessentially a credibility contest.
Hospitality submits it promptly effectuated settlement by settling the case about seven months after the verdict, after extensive settlement discussions including Grafs unequivocal rejection of three settlement initiatives in March of 2010 and a written offer of the policy limits on July 16, 2010. Ultimately, on November 4, 2010 Graf agreed to accept and Hospitality agreed to pay its policy limits plus postjudgment interest in the sum of $552,007.55 in settlement of the underlying litigation, while reserving Grafs right to litigate separately a coverage dispute—litigation in which Hospitality ultimately prevailed. See Graf v. Hospitality Mut. Ins. Co., 956 F.Sup.2d 337 (D.Mass. 2013) (Nieman, M.J.), affirmed, Graf v. Hospitality Mut. Ins. Co., 754 F.3d 74, 77 (1st Cir. 2014).
Hospitality viewed the jury verdict as unexpected both on liability and damages, and believed it was likely the result of jury anger resulting from erroneous evidentiary rulings by the trial judge on state of mind issues, which gave Hospitality good grounds for the appeal it pursued while simultaneously attempting to settle Grafs tort claim. Any post-verdict delay in achieving settlement, Hospitality submits, was attributable to Grafs refusal to accept Hospitality policy limits in settlement of Grafs claims against its insureds, which refusal was based on Grafs erroneous interpretation of the amount of Hospitality policy limits.
FINDINGS AS TO HOSPITALITY’S DEFENSE OF THE UNDERLYING LITIGATION
1. Grafs Asserted Basis for Her Tort Claim
The parties to the underlying tort litigation were plaintiff Katie Graf ofWestfield, Massachusetts, Torcia & Sons, Inc., a Massachusetts corporation which conducted its business as The Fat Cat Bar and Grill (“Fat Cat”), on Worthington Street in Springfield, Massachusetts, and Ronald Lindsey (“Lindsey”) of Springfield, a bouncer at the Fat Cat, which sold food and alcoholic beverages to patrons of the general public.[1]
In the early morning hours of September 7, 2007, Graf was a patron at the Fat Cat who sustained serious and permanent injuries when, as she claims, she was carelessly and negligently thrown or pushed to the floor by Lindsey. Lindsey was then acting as a doorman and bouncer engaged in quelling a disturbance that did not involve Graf. Graf contended she was picked up and thrown by Lindsey four to six feet and testified at the trial that she went “flying through the air.” In her answers to interrogatories she stated she was thrown approximately eight feet. In her deposition she testified she felt “airborne” and thrown, not pushed. Grafs close friend and companion that night, Jamie Mongeau, witnessed the incident and corroborated Grafs version testifying she saw Lindsey pick Graf up by the shoulder area and toss her. Graf admitted she consumed four or five Bud Lite beers at her friend Mongeau’s home before entering the bar at about 11:30 p.m., where she consumed another beer inside the bar, and two more Bud Lites on the bar’s patio.
2. Hospitality’s Insureds Dispute Grafs Version of Events
Hospitality’s insureds disputed Grafs version of how she was injured, principally because Lindsey *15 maintained from the start, and so testified, that he never even touched Graf. Fat Cat’s manager Shavone Gauthier stated in her interview that “one guy pushed [the] other and [Graf] got knocked over and twisted her ankle.” In her deposition Gauthier testified she saw two boys in the bar pushing each other, and saw Graf on the ground before Lindsey arrived to break up the altercation. While Lindsey agreed he took action to break up the altercation, he claimed he had a clear path on the patio to reach the area where a fight was occurring and did not need to touch anyone to approach the area of the fight. Lindsey testified at his deposition and at trial that he had been at the bar’s front door, but then approached an altercation out on the patio passing through the entranceway from the main bar. Lindsey further testified that Graf was on the far side of the altercation from him, nearer the band. He testified he did not reach Grafs side of the group and he touched neither Graf, nor anyone else, except when he squeezed in between people and said “excuse me” and that he “came into contact with people. When you are shoulder to shoulder, it’s hard not to walk by somebody without maybe touching them.” Lindsey maintained he was physically incapable of picking up and throwing Graf—-who weighed approximately 110 pounds—or anyone else. Grafs testimony that she was not involved in the altercation was subject to contradiction by her statement recorded in her hospital record. Graf and her friend Mongeau were the only eye witnesses to the incident. Although Lindsey was responsible for Fat Cat security and safety, he never asked Graf how she injured her leg. Shavone Gauthier, the Fat Cat manager responsible for safety, previously worked at McDonalds and had taken courses in forensics, but never asked Graf how the incident happened nor did she take the names of any witnesses.
3. The Ambulance Dispute
A hotly contested issue in the claim and at trial was why the Fat Cat staff never called an ambulance for Graf despite well-knowing she had suffered a serious injury to her ankle. Graf testified she asked the bar manager to call an ambulance but he refused saying it would be much easier to pull a car up to the street behind the Fat Cat where he would then help Graf and her friends carry her out. Graf identified the bar manager by description only as a muscular male with a blonde goatee who did not identify himself when he came over to her while she was sitting on a bench. She testified she thought this man gave her ice.
The Fat Car denied it employed any muscular male with the blond goatee, much less as its manager, and further denied such a man even existed. Gauthier testified that she was the Fat Cat manager, and that she was the one who tended to Graf, offering her water and ice.
Gauthier testified that when she saw Graf attempt to stand, Gauthier told her: “No, you need to sit down. Obviously your ankle is swollen. I then asked her—I said do you want me to call an ambulance, and are you ok? She said I don’t think I’m ok.” Gauthier claimed Graf never asked her for an ambulance. To the contrary, Gauthier testified that she asked Graf if Graf wanted an ambulance but Graf replied—"no." Gauthier’s further explanation for not calling an ambulance was that after Graf de-clined an ambulance she spoke with a Springfield Police officer on duty that night about calling an ambulance, but the police officer advised her that if the injured patron did not want an ambulance then there was “nothing she could do.”
But the jury did not hear Gauthier’s further explanation because the trial judge excluded her conversation with the police officer as inadmissible hearsay. Grafs friend Mongeau testified that a bar employee helped carry Graf to Mongeau’s SUV after the incident, because Graf was not able to walk on her own. Graf was driven by Mongeau from the bar to Baystate Medical Center.
4. Hospitality’s Assessment of the Extent of Grafs Claimed Injuries
Graf, then 22 years old, sustained a fracture of the ankle, which required an open reduction and internal fixation surgery of the right ankle medial and lateral malleoli. Graf was released at 4:38 p.m. later that day. She incurred $19,199.81 in medical expenses and claims she was left with a permanent left lower extremity impairment, a permanent left foot impairment, and a permanent whole person impairment of 6%.
The extent of Grafs injuries were also contested. Graf claimed she felt “the most excruciating pain I’ve felt in my life.” Mongeau would testify that “[Graf] was in excruciating pain to the point where she really could not even talk.” But Grafs pain description, arguably, was contradicted by the emergency room admission notes that record Graf “appears somewhat anxious, in no acute distress”; and her heart was noted to have “normal rate and rhythm.” Her ankle had “no significant deformity. She is tender to palpation diffusely about the ankle.” The hospital record does note that Graf gave a histoiy that she was injured when “the bouncer threw her down to the ground” and that she suffered “severe” ankle pain.
Hospitality claimed Grafs permanent injury was open to question since she disregarded her doctor’s instructions on December 5, 2007 to followup in three months if her symptoms worsened or persisted. She did not return again to the doctor until nearly two years later on November 10, 2009, shortly before trial. Graf made no claim for loss of income or earning capacity since she was a longtime recipient of Social Security Disability Insurance benefits, before and after the incident.
*16 5. Hospitality’s Pretrial Assessment of its Insureds’ Liability
Prior to March 31, 2008, the day Graf filed suit, LLJUA did not agree that Lindsey or the Fat Cat were liable for Grafs claims. On that day, Graf sued Lindsey and the Fat Cat in Hampden County Superior Court.
Attorney Kathleen E. Sheehan, Esq. (“Sheehan”) appeared for and defended Lindsay and the Fat Cat throughout the proceeding. Sheehan was and is an accomplished trial lawyer with considerable years of experience in a wide variety of areas including liquor liability and premises liability. Sheehan, a partner at Keyes & Donnellan, was admitted to practice law in Massachusetts in 1981, has concentrated her practice in personal injury and civil litigation, has tried over 60 personal injury cases to a jury, and has negotiated settlements in many more cases. The parties agree Sheehan was well-qualified to represent Hospitality’s insureds. Graf was represented throughout the litigation by her present counsel Mark J. Albano, Esq. Albano, too, was and is a very accomplished trial lawyer with a wide range of expertise and experience representing both tort plaintiffs and insured defendants.
Between June 15, 2009 and January 2, 2010, Sheehan wrote 19 separate reports to Hospitality, and had numerous telephone calls with Hospitality’s Senior Claims Representative Stephanie George[2] and her supervisor, Hospitality’s Vice President of Claims Dana Marchant,[3] regarding various aspects of the discovery and investigation. Sheehan took the depositions of Graf and her friends Jamie Mongeau and Mongeau’s sister. In all, the parties took seven depositions and Sheehan wrote reports to Hospitality regarding each.
Eighteen months into the litigation, Albano sent Hospitality a letter dated September 25, 2009 demanding settlement of Grafs claims against Lindsey and the Fat Cat for $300,000. In its response dated September 30, 2009, Hospitality denied liability and did not make or tender an offer of settlement to Graf.
Roughly ten months before trial, Hospitality, in a Reserve Worksheet dated April 1, 2009, estimated the full value of Grafs claim at $100,000 and that there was a 50% chance that its insureds would prevail at trial. Hospitality elected not to make any offer of settlement to Graf before trial. In January 2010, on the eve of trial, Sheehan wrote a pretrial report which outlined for Hospitality the results of the defense investigation. Since Graf had less than $20,000 in special damages, had reported improved range of motion, no arthritis and had a long gap between doctors’ visits until shortly before trial, Sheehan wrote that the potential verdict, was “between $40,000.00 and $80,000.00.”
By letter dated December 22, 2009, just weeks before trial, Albano made a written demand for relief under G.L.c. 93A, §9, in which he notified and informed Hospitality of Grafs claims, reasonably described Grafs claims and her proximately resulting damages and losses sustained. Hospitality sent Al-bano a Januaiy 14, 2010 response in which Hospitality did not tender an offer of settlement. Specifically, Ms. George’s response to Albano denied liability and explained:
[Ms. Grafs] allegation that she was picked up and thrown 8 feet by a member of the insured’s security staff is not supported by the results of our inquiry. Nor is her claim that she did not know anyone involved in the altercation, since the medical records site her as saying she was injured at a club when she was trying to help a friend who was in an altercation. These inconsistencies in the descriptions of what occurred create legitimate ques-tions as to the correct version. Therefore liability is not reasonably clear as you profess.
In a January 2010 telephone call to Sheehan, Al-bano reduced his pretrial settlement demand from $300,000 to $125,000. Sheehan relayed the demand to Hospitality. Because Hospitality expected to win the suit on liability, Sheehan advised Albano that same month that Hospitality declined to make a settlement offer in response to the $125,000.00 demand.
6. The Pertinent Liability Disputes at Trial and the Verdict
The case was tried to a jury for three days from January 28 to February 1, 2010. The parties agree that trial was primarily a credibility dispute between Graf, with her friend Mongeau supporting her version of the incident, and the version put forth by the bouncer, Lindsey and Fat Cat’s manager, Gauthier. Graf contends, however, that it was no “contest” on credibility because the statements and testimonies of Gauthier and Lindsay were so suspect that Hospitality should have deemed them as entirely incredible. Graf, of course, points to the jury verdict as proof positive.
Hospitality, on the other hand, throughout the trial continued to view Grafs claim that she was somehow hurled in mid-air by Lindsay a distance of between four or eight feet was so implausible as to destroy Grafs credibility. It will suffice to conclude that each side presented formidable arguments undermining the credibility of their respective opposing witnesses as being biased in favor of the party calling them. For example, Mongeau, who corroborated Grafs version of her accident, was open to the charge of bias because she described herself as the plaintiffs “really, really good friend.” On the other hand, Gauthier, Fat Cat’s manager was also vulnerable to a bias charge given her admission that she had been working at the bar for several years; working, as Albano argued to the jury, as Fat Cat’s chief cook and bottle washer doing everything from loading the coolers to counting the cash, but had never been paid.
Because none of these fact witnesses testified before me, I am unable to draw any reasonable infer- *17 enees, one way or another, on who would or should have been deemed by Hospitality as more or less credible. The same can be said of Hospitality’s pre-suit, pretrial and trial assessments of the credibility of the witnesses; or of Hospitality’s assessment of its prospects with a second juiy if its appeal yielded a new trial. Having never seen the witnesses and observed their demeanor, I cannot make any findings related to their credibility.[4]
As could be anticipated, a key factual dispute at trial surrounded Grafs testimony—permitted after the trial judge denied Sheehan’s motion in limine to preclude it—that she asked the Fat Cat staff to call her an ambulance but was refused. Fat Cat’s manager Gauthier flatly disputed Graf, testifying that she asked. Graf if she wanted an ambulance but Graf said no. Grafs testimony that the Fat Cat’s refusal/failure to call an ambulance was admitted as evidence of consciousness of liability.
After admitting Grafs evidence on the ambulance issue, the judge then excluded Fat Cat’s proffered evidence which sought to explain why its manager, Gauthier, elected not to call an ambulance, namely, a statement made to Gauthier by a Springfield Police officer in the aftermath of the incident that if an injured patron did not want an ambulance, then there was nothing she could do. Sustaining Albano’s objection, the judge excluded this as inadmissible hearsay. Sheehan pressed the issue, arguing that police officer’s statement to Gauthier was offered, not for its truth, but rather, as evidence of Gauthier’s state of mind as to why she did not call for the ambulance.
Sheehan preserved the ambulance issue for appeal with a timely offer of proof to the judge presenting how Gauthier would have testified if permitted: “[S]he [Ms. Gauthier] has someone who was at her bar and refusing an ambulance, what can she do. And, then I expect her to respond that they [the Springfield Police officers] will say there’s nothing you can do.” Again, Sheehan argued that the police officer’s statement to the bar manager was not hearsay because it was evidence of the bar manager’s state of mind explaining why she did not call an ambulance, and was relevant to the issue of defendants’ consciousness of liability raised by Graf. In response, Albano argued that “the state of mind exception goes to the state of mind of the declar-ant, which in this case would be the police officers.” The judge agreed with Albano stating: “I believe that’s correct. The objection is sustained,”[5] excluding the evidence. In his closing argument Albano skillfully argued to point that Fat Cat had not called an ambulance:
It would be perfect, perfect justice if you had a magic wand, ladies and gentlemen of the juiy, and you can waive it over Katie and say we’ll go back to September 6th and 7th and we’ll have it such that there were more bouncers or such that Mr. Lindsey was a little bit more careful or such that an ambulance came and the Fat Cat did a little bit more action and less words and Katie would never be injured. She would not have the permanent partial disability that she’s going to have to live with for the rest of her life.
At the conclusion of a three-day trial, the juiy returned a verdict for Graf for compensatoiy damages in the amount of $500,000.
7. Hospitality’s Reaction to Grafs Verdict, Its Decision to File Post-trial Motions, and Its Decision to Retain Attorney Ryan
On the day of the verdict, Sheehan made two telephone calls, one to Mar chant and another to Hospitality’s President John Tympanick. Tympanick had been employed by LLJUA and Hospitality since 1991 and has been the company’s President and CEO since January 2005. Tympanick had been employed by LLJUA and Hospitality since 1991 and he has been the company’s President and CEO since January 2005. He was the primary decision-maker on the Graf claim after the verdict.
Sheehan told Marchant and Tympanick she was “shocked” by the verdict, both on liability and damages; that there were appealable issues, and she should file a motion for a new trial. In particular she told them that the entire case was a credibility contest and that the trial judge’s errors on evidentiaiy rulings tainted the jury’s perception of the credibility of the witnesses. Sheehan recommended she file post-trial motions to vacate and/or reduce the damages awarded to Graf.
Hospitality concurred with Sheehan’s recommendation and on February 16, she filed post-trial motions seeking judgment notwithstanding the verdict, a new trial and a remittitur of damages. Sheehan’s post-trial motion devoted nine pages to the issue of the admission of consciousness of guilt evidence, and the erroneous ruling that denied Gauthier her right to explain her conduct. The motion included, at page 9:
Thus, the courts have held that the defendant has an unqualified right to negate the inference of consciousness of guilt by explaining to the jury why he took the action in question. Commonwealth v. Chase, 26 Mass.App.Ct. 578, 580-81, 530 N.E.2d 185, 187-88 (1988) (and citation); Commonwealth v. Garuti, 23 Mass.App.Ct. 561, 566-69, 504 N.E.2d 357 (1987).
Just days after the verdict, on February 9, Hospitality consulted and retained Attorney John P. Ryan, a senior partner at Sloane & Walsh, LLP, to represent and advise it in regard to issues arising from the February 1 verdict. Ryan was admitted to practice law in Massachusetts in 1974. He has concentrated in civil litigation. He has tried approximately 150 jury cases, many complex, and has represented parties in appeals in over 30 civil cases. Ryan has represented numerous insurers in coverage actions, bad faith claims and *18 Chapter 93A/176D claims. He has negotiated hundreds of settlements of his own clients’ cases and has mediated approximately- 800 more. It is agreed that Ryan was well qualified to represent and advise Hospitality on insurance coverage, c. 93A, c. 176D and other issues arising from the verdict.
Thereafter on, February 24, Sheehan had a one- and-a-half-hour conference call with Ryan, Marchant, Tympanick, Attorney Myles McDonough from Ryan’s office, and William McGrail, an experienced insurance professional who was vice chair of Hospitality’s board of directors. They discussed the surprise verdict and its amount which, with prejudgment interest, was in excess of the policy limits, the post-trial motion, appellate issues and overall strategy.
More specifically, on the February 24 call, and on other dates, Sheehan advised Hospitality that what she considered to be the trial judge’s erroneous evi-dentiary rulings—admission of consciousness of liability evidence but exclusion of explanatory evidence—harmed the defendants in at least three ways: (1) that there were major credibility issues throughout the case, in that Grafs credibility was highly suspect but that Gauthier also had credibility problems, and the exclusion of evidence as to why an ambulance was not called dramatically harmed Gauthier’s credibility, tipping the scales in favor of Graf; (2) the judge’s rulings were harmful because they permitted plaintiffs counsel to unduly emphasize the defendants’ post-accident conduct, irrelevant to the occurrence of the accident except ostensibly to show consciousness of guilt; (3) the rulings enabled plaintiffs counsel to create an evidentiary basis for a theme that the defendants did not care about Graf, that she was simply “in the way,” thereby permitting Albano, in his closing, to reference the ambulance issue multiple times and the Fat Cat’s irresponsible failure to call an ambulance to help Graf.
Sheehan advised Hospitality that the judge’s exclusion of the Fat Cat manager’s explanation for not calling (as opposed to refusing to call) an ambulance cast grave doubt on Gauthier’s credibility extending to all issues, thereby fueling the jury’s anger and producing what she considered the enormous verdict.
The next day, February 25th, the Graf verdict was discussed at a meeting of Hospitality’s Board of Directors. The meeting minutes reflect that the verdict was a surprise, and that trial counsel had filed and was awaiting decisions on three mo-tions, including one for a new trial. The minutes state in part:
They’ve (defense counsel) drafted three motions: 1.) Judgment notwithstanding the verdict. 2.) Material mistake by one of the judge’s rulings in an effort to get a new trial. This is due to the fact that the injured woman accused the bar of not calling her an ambulance, even though the doorman had no legal duty to do so. However, the judge allowed the plaintiff to testify about it. (Management believes this is truly an appealable issue and is considered prejudicial exclusion of evidence) . . .
Excerpt from Minutes, February 25, 2010.
By his Memorandum and Order dated March 2, 2011, the trial judge denied Sheehan’s post-trial motions.[6] As of March 31, 2010, the Amended Judgment entered in the Litigation as of February 5, 2010 totaled $614,817.59, and included the jury verdict in the amount of $500,000 in compensatory damages, $111,124.26 in prejudgment interest and $3,693.33 in costs.
Hospitality still had not made Graf a formal offer of settlement.
8. Hospitality’s Advice from Attorney Ryan on Hospitality’s Obligations Under Chapter 176D, and Hospitality’s Decision to Appeal and to Pursue Settlement with Graf
On March 15 Sheehan, in her Post-Trial Report to Hospitality, and in evaluating an appeal, stated in part to Hospitality:
The Appealable issues include the fact that the court’s allowing into evidence that defendants allegedly refused to call an ambulance was not harmless error; the introduction into evidence that the defendant, Ronald Lindsey failed to call an ambulance was not relevant and was not harmless error; and lastly the jury’s award of damages is excessive based upon the evidence. Prior to the trial, defendants had brought a Motion in Limine requesting the court exclude from testimony any reference to the allegation that the defendant, The Fat Cat and/or Ronald Lindsey, refused to call an ambulance for the plaintiff. The court allowed the evidence on the theory of “consciousness of guilt.” The defendant Lindsey objected to the use of the evidence based first on the claim that it should not be introduced against him as there is no statutory or regulatory obligation or obligation by ordinance that he call an ambulance. As to The Fat Cat, the defendants argued that it should not be introduced as to The Fat Cat since there was no negligence allegation against The Fat Cat and furthermore, The Fat Cat was denied the opportunity to refute the evidence. By denying The Fat Cat the opportunity to refute the evidence, it had the effect of denying Ronald Lindsey the opportunity to refute the evidence of consciousness and guilt. . .
I would recommend that the case be appealed, although I would not put the chances of success over 20%. Plaintiff has refused an offer to mediate the case and has now stated verbally that if the verdict amount post judgment interest were offered, he would refuse to accept the offer.
Sheehan’s 20% success estimate was a reflection of her view of appeal success in general in civil cases. Sheehan told Tympanick orally that she thought the likelihood of success on this particular appeal was *19 over 50%, and that this case had a better chance on appeal than the typical civil case because the judge’s ruling was clearly wrong and it was harmful to the defendants.
On April 26 Marchant filled out a Hospitality Claim Information form that stated: “Loss Reserve: $500,000.00; Full Value: $500,000.00; Chance of Loss: 100%.” But by filling in “100%” as the estimated “chance of loss,” Marchant did not mean the appeal lacked merit. Merchant was familiar with reserve setting practices and understood that in order to adjust the reserve on the claim, the full policy limit after the verdict required him to write “100%” as the “chance of loss.” Merchant still believed that the trial judge had committed errors, the verdict was improperly based, the verdict was excessive for a broken ankle, and that the appeal had good grounds and should be pursued to see if the errors could be corrected and the judgment reversed.
Tympanick agreed with Marchant’s assessment. In arriving at his decisions, Tympanick sought and relied on (a) information and legal advice from Sheehan, who tried the case and knew the facts, (b) Marchant’s advice, and (3) legal advice from Ryan as to Hospitality’s obligations under c. 176D and duties to its insureds.
Neither Tympanick, Marchant nor Ryan had any prior dealings with Albano or Graf and they bore no animosity toward either. Their decisions were based on their analysis of the merits of the case, what they perceived to be the valid grounds for appeal and Albano’s emphatic and repeated statements—corroborated by his actions—that Graf would not settle for what Hospitality believed were its policy limits.
9.Hospitality Follows Ryan’s Advice to Follow a “Two-Track” Approach: Pursue Both an Appeal and a Settlement
Ryan’s legal advice to Hospitality was that it should follow what he deemed as a “two-track” approach. Ryan recommended that Hospitality should tiy to settle the case, in preference to an appeal. However he also advised Hospitality that the appeal had merit because there was a “sound good faith basis to appeal,” and that the appeal was necessary to protect the insureds’ interests in being protected from the excess verdict, and that Hospitality should proceed on two tracks simultaneously, trying to settle the case while pursuing the appeal. With respect to Sheehan’s percentages of success on appeal, while Ryan agreed that the 20% estimate of success was generally consistent with the experience of success of appeals on all civil jury trials, he did not provide Hospitality with his percentage chance of success on this particular appeal. Ryan never gives “specific percentages” because he believes that is “virtually an impossible task.”
More specifically, Ryan advised Hospitality in February and March that in the circumstances of Grafs suit he believed Hospitality had a sound, good faith basis for an appeal, based predominantly on the trial judge’s erroneous ruling precluding Gauthier’s testimony of her conversation with the police officer concerning the calling of an ambulance, the absence of any legal duty on the bouncer Lindsey to call an ambulance as described in Sheehan’s post-trial motion. He advised Hospitality that although it had a good basis for its appeal on the consciousness of liability issue, statistically most civil appeals do not succeed, and that Hospitality should pursue a separate track to attempt to settle the tort suit and obtain releases of the insureds’ liability.
Ryan based his advice at the time on general statistics on appeals in civil cases, his review of Sheehan’s post-trial motion, and on Sheehan’s description of the events and issues at the trial, since a trial transcript had been ordered on March 9, but not yet received. Ryan’s opinion was that the evidentiary issue on appeal re-garding the defendants’ inability to respond on the consciousness of liability issue “was a very significant issue. Was more than good faith, I believe, was more than reasonable. I thought it was a substantial issue.” Ryan opined it was “a substantial and reasonable basis to take the appeal,” and while Ryan advised Hospitality that its appeal had merit, he advised it probably would not be successful.
Tympanick was aware of the requirements of c. 176D, had attended at least one MCLE seminar on it, and intended at all times to comply with c. 176D. Tympanick believed that liability was not reasonably clear even after the verdict because errors by the trial judge created appealable issues, as described to him by Sheehan and Ryan, especially in regard to the consciousness of guilt issues and the incorrect inference that the bar and its bouncer Lindsey improperly refused to call an ambulance which led to jury anger and an unfair trial. Thus, Tympanick believed an appeal from the Graf verdict had a significantly better likelihood of success than the typical appeal in a civil case.
Acting on this advice and these considerations, on March 12th Sheehan filed the Notice of Appeal on behalf of Hospitality’s insureds.
10.Hospitality’s Assessment of its Post-Verdict Duties to its Insureds
Ryan also advised Hospitality that under Massachusetts law, Hospitality had an ongoing duty to its insureds that required it to pursue an appeal where it could do so in good faith and a successful appeal could affect the rights of its insureds, in particular here where there was a judgment against the insureds in excess of the policy limits. Hospitality accepted and followed this advice.
11.Hospitality’s Post-Verdict Settlement Efforts
On March 5 Hospitality had made an overture of settlement to Albano. Sheehan called Albano and *20 advised that Hospitality was requesting plaintiff to attend mediation, or whether Graf would be open to settling the case for the policy limits. Albano, apparently without asking his client, answered that his client was not willing to attend mediation and he told Sheehan that Graf was entitled to the full judgment with prejudgment interest, costs and postjudgment interest to date. Sheehan then told Albano that $500,000.00 plus postjudgment interest to date constituted Hospitality’s full policy limits.
Sheehan’s invitation to mediation and inquiry about Grafs willingness to accept the policy limits was not a formal settlement offer, per se, but Sheehan necessarily implied, and it was likely understood by Albano, that an offer of settlement would be made at the mediation. Thereafter, Sheehan called Hospitality (Marchant) and reported that she had spoken with Albano, as instructed by Hospitality, and she advised Graf was unwilling to settle for the policy limits, and was unwilling to attend mediation. But Sheehan had no authority from Hospitality to settle for any dollar amount when she made her overtures, other than the authority to go to mediation and to explore with Albano Grafs openness to accept Hospitality’s full policy limits of $500,000 plus accrued postjudgment interest.
On March 15, Sheehan, at Hospitality’s request, again called Albano and asked if Graf would be willing to attend mediation in an effort to negotiate a settlement. In that conversation, Albano again advised Sheehan that Graf would not attend mediation, again without pausing to consult with his client. In that same conversation, Sheehan then asked Albano if Graf would settle the suit for the full policy limits, $500,000 plus postjudgment interest, if she could get it Albano told Sheehan that Graf would only settle for $500,000 plus all accrued prejudgment and postjudgment interest. He told her that Graf would not accept $500,000.00 and postjudgment interest even if it were offered. Albano did not say he needed to consult his client, did not ask Sheehan if she was confident she could get authority for settlement in that amount and did not ask if she would recommend that amount to Hospitality.
In that same conversation, Albano told Sheehan that if Hospitality would not pay the approximate $115,000 in accrued prejudgment interest, Hospitality submitted was in excess of its policy limits, Graf would collect it from the insureds’ own assets. In that telephone call Albano gave no indication of willingness to settle on any terms except for payment of the full judgment with all pre- and postjudgment interest.
12. Graf Successfully Moves to Attach the Fat Cat’s Liquor License and Demands that Hospitality Cover the Cost of the Bond to Dissolve Grafs Attachment
In the course of their aforementioned March 15 settlement conversation, Albano told Sheehan he would obtain an attachment against the Hospitality insureds’ assets to secure Grafs recovery of the amount of the verdict in excess of $500,000, the face amount of Hospitality's policy, namely, the $115,000 in prejudgment interest Hospitality submitted was not covered under the policy. (Hospitality always agreed the postjudgment interest was covered under the policy.) Albano submitted to Sheehan that Grafs attachment for $115,000 would then require Hospitality, under the policy, to post a bond to release the attachment, and that the cost of the bond would be $115,000, the same amount which Hospitality had refused to pay in order to cover the prejudgment interest. Thus, Albano argued that for these reasons, Hospitality should settle that case by simply paying Graf the $115,000 in prejudgment interest along with the $500,000 and postjudgment interest and costs.[7]
On March 15, Sheehan called Marchant and reported that Graf would not attend mediation and that Graf would only settle for $500,000.00 plus approximately $115,000.00 in prejudgment interest, plus postjudgment interest. Sheehan told Marchant that Albano had told her that Graf would not accept $500,000.00 plus postjudgment interest if Hospitality offered it. Sheehan also shared with Marchant Albano’s theory that Hospitality would be required to post a bond to release Grafs expected attachment against the insureds for the amount of the judgment in excess of the $500,000.00 policy limit. Marchant then contacted Ryan’s office and asked for a legal opinion on whether the Hospitality policy required Hospitality to purchase a bond to release a post-verdict attachment against an insured for an amount in excess of the policy limits, as Albano had argued.
Ryan advised Hospitality in April that Hospitality’s policy provided coverage for “damages” (including a verdict plus prejudgment interest), but only up to the $500,000.00 policy limit, and the policy did not require Hospitality to obtain a bond for an attachment on the amount of the judgment that exceeded the policy limit. Hospitality’s coverage position—in reliance on the legal advice of Ryan—has been that its policy’s limits of $500,000.00 mean that it covered “damages” which included the verdict ($500,000.00) plus prejudgment interest ($111,124.26), but only to the extent of the policy limits of $500,000.00, and that in addition the policy covered court-awarded costs (here $3,693.33) plus postjudgment interest. Its position was and is that the policy did not require Hospitably to purchase a bond to release the attachment Graf later obtained against the bar’s liquor license. Hospitality believed its coverage position, supported by the opinion of its legal counsel, was reasonable.
On March 18, Albano mailed to Sheehan a letter stating his intent to discover the “assets of your clients, the defendants, Torcía & Sons, Inc. d/b/a The Fat Cat Bar and Grill and Ronald Lindsey, all so that my client may reasonably secure and collect that portion of the judgment in her favor which Hospitality *21 Mutual Insurance Company maintains is not covered by insurance,” and demanding that Hospitality pay for bonds to cover attachments, and serving Plaintiffs Motion for an Order of Attachment of the Liquor License of the Defendant, Torcia & Sons, Inc., and also serving a Motion of the Plaintiff for Order of Keeper Attachment as to Defendant Torcia & Sons, Inc.
On March 19, Albano served on Sheehan a notice of Rule 30(b)(6) deposition of the Defendant Torcia & Sons, Inc., and a notice of deposition of Ronald Lindsey, both for April 6 and both with requests for production of their financial records. On March 24, Sheehan mailed to Albano a letter requesting that the plaintiff attend mediation and requesting that Albano provide the names of three mediators acceptable to the plaintiff. Albano did not reply to Sheehan’s March 24 letter, did not agree to attend mediation, did not select any mediators, and did not make any counterproposal to the March 24 letter.
On April 5, Albano filed motions for an attachment of Torcia’s liquor license and for a keeper attachment of Torcia’s assets. On April 9, the trial judge allowed Grafs motion for an attachment of Fat Cat’s liquor license in the amount of $115,000.00 as “over and above any liability insurance shown by the defendant to be available to satisfy the judgment” because the amended judgment of $614,817.59 exceeded Hospitality’s $500,000 of coverage.[8]
On April 9, the trial judge allowed Grafs motion for an attachment of Torcia’s liquor license On April 13, Albano wrote to the Hampden County Sheriff s Department instructing it to “make immediate service and levy upon this Writ of Attachment” at the home of Michael Torcia. On April 21, Albano sent a letter to Hospitality demanding that Hospitality immediately pay the cost of the bond necessary to release the attachment of Torcia’s liquor license. On or about April 5, Albano had been told that a keeper attachment would put Torcia & Sons, Inc. out of business. On May 5, Albano wrote to the clerk to request a hearing on May 12, for his previously filed motion for an order of keeper attachment as to the defendant, Torcia & Sons, Inc.
On May 10, Graf filed this Complaint under c. 93A. Prior to April 29, 2010 Albano had threatened to file a 93A claim against Hospitality. Ryan had advised Hospitality in April 2010 that in his opinion its actions and decisions were made in good faith, had a sound legal basis, and did not violate G.L.c. 93A or c. 176D.
On April 29, 2010 the minutes from the Hospitality Board of Directors meeting reflect:
All involved were surprised that their client employees were not able to testify that they asked the plaintiff if she wanted an ambulance, since the plaintiff was allowed to testify that the plaintiff would not let her call an ambulance . . . He also noted that HMIC is pursuing an appeal. There was some concern of the filing of a 93A claim, but Mr. Ryan and Mr. Marchant agreed that plaintiff counsel would be unsuccessful in pursuit of a 93A claim against HMIC.
Hospitality supported Sheehan’s decision to file and pursue the appeal, and Ryan’s advice to follow two tracks simultaneously, trying to settle the case and pursuing the appeal. Among Hospitality’s reasons were: (1) Sheehan’s advice; (2) Ryan’s advice; (3) Grafs apparent refusal to settle for the policy limits when the subject was explored by Sheehan in a conversation with Albano, even though Sheehan never made such an offer, nor was she authorized to make such an offer;[9] (4) Hospitality’s obligation to protect its insured from an excess judgment; (5) the errors on evidentiary rulings which Hospitality believed (per the advice of Sheehan and Ryan) were committed by the trial judge which Hospitality considered caused significant harm to the insureds; and (6) the likelihood of a better outcome at trial if a new trial could be obtained.
On June 17, Albano sent a new G.L.c. 93A demand letter to Ryan, which incorporated by reference the plaintiffs April 21st demand to Hospitality demanding that Hospitality immediately pay the cost of the bond necessary to release the liquor license attachment. In his June 17 letter, Albano demanded that Hospitality obtain a bond, at a cost of $117,300.00, to release an attachment he had obtained against Torcia’s liquor license on April 9, 2010.
On July 1, Albano re-noticed the deposition of Torcia and served Plaintiffs Second Request for Production of Documents, to discover assets of Torcia. On July 6, Sheehan docketed defendants’ appeal with the Appeals Court. On July 16th Hospitality made its first formal offer of settlement through a letter from Ryan to Albano, offering Graf “$500,000 plus post judgment interest through an agreed upon date ... in exchange for a release of the defendants [in the Litigation] to the satisfaction of counsel for the defendants.” Graf, through Albano, declined the settlement offer.
On July 23, Albano sent an email to Sheehan stating that “. . . the insurer remains intransigent on the interest/bond issue. Therefore I need to move on the keeper attachment.” On August 1, Albano sent a letter to Ryan requesting that Hospitality either pay the amount of the jury verdict plus prejudgment interest plus costs plus postjudgment interest, or purchase the bond previously requested and pay the plaintiffs expenses incurred in recording the attachment. Even after Ryan’s offer of the policy limits on July 16, Albano, on Grafs behalf, continued to demand that Hospitality pay Graf $500,000, its policy limits, plus postjudgment interest plus costs, and $115,000 to purchase a bond to release the attachment Graf had obtained against Torcia’s liquor license.
To this point—although the parties had engaged in detailed, earnest settlement talks—(a) Graf never made a post-verdict, settlement demand within the *22 policy limits and never was willing to release the insureds in exchange for payment of the policy limits; and, Hospitality had not made a post-verdict formal settlement offer tendering to Grafs policy limits.
13. Hospitality Negotiates a Partial Settlement Agreement with Graf with a “Carve-Out” to Permit Graf to Pursue Declaratory Judgment Litigation on the Prejudgment Interest and Bond Cost Coverage Issues, and her Claim Under c. 176D Issues
On August 16, Ryan responded to Albano’s August 11 letter, and again explained why Hospitality’s insurance policy did not provide coverage to pay the cost of a bond necessary to release the subject attachment. In the letter, Hospitality extended a new offer of settlement to Graf. Specifically, it reiterated the July 16 offer to settle Grafs tort suit by paying the full policy limits of $500,000, plus postjudgment interest plus court-assessed costs, and added a proposal to have the parties carve out and litigate in a subsequent declaratory judgment action the dispute over whether the Hospitality policy required Hospitality to purchase, as Albano claimed, a bond to release the attachment that Graf obtained to secure the $111,124.26 that exceeded the $500,000 policy limits. Ryan’s letter proposed that Graf could continue to pursue her c. 176D claim against Hospitality, and Hospitality would pay the disputed $111,124.26 if it lost in the declaratory judgment action. Both of Hospitality’s offers were contingent on Graf releasing all claims against Hospitality’s insureds Torcía and Lindsey.
After Ryan’s August 16 letter, lawyers for Graf, Hospitality and its insureds negotiated the terms of a partial settlement. During those negotiations Albano demanded that if Hospitality won the proposed declaratory judgment action, Graf would resume her efforts to collect the $111,126.26 excess judgment from the assets of Torcía and Lindsey. Hospitality responded, as it always had, that it would not settle the tort suit unless Graf provided a full release to Torcía and Lindsey. When Hospitality would not relent on this point, Graf relented, and it was agreed that terms for the insureds’ release would be included in the final executed Agreement of Partial Settlement and Assignment.
Meanwhile, on September 30, Sheehan filed with the Appeals Court Defendants’/Appellants’ Brief and Appendix in support of the appeal that had been entered on July 6.[10] On October 25, Albano emailed a draft settlement agreement to Ryan, and the two exchanged related emails on October 25, October 26 and October 27. On October 28, Grafs claims were partially settled on the terms set forth in the Agreement of Partial Settlement and Assignment. Pursuant to the Agreement, on November 4, Hospitality paid out $552,007.55 as follows: $541,155.83 to Graf, through Albano, and $10,851.72 to MassHealth. The amounts paid represented $500,000.00 plus $4,071.93 for court-awarded costs plus the balance for postjudgment interest, but did not include anything for prejudgment interest.
14. Grafs Declaratory Judgment Action to Determine Hospitality’s Policy Limits
Thereafter, Graf, exercising her rights under the “carve out” provisions of its settlement agreement with Hospitality (as assignee of the rights of Torcía the attached party, against Hospitality) filed suit in the Hampden County Superior Court seeking a declaratory judgment that Hospitality was required under its policy to pay for the cost of the bond to release Graf s attachment of the Hospitality insureds’ assets following the jury’s excess verdict. If Graf prevailed, Hospitality would be required to post approximately $115,000 in cash or other collateral, and pay an annual premium of $2,300 to keep the bond in place. The partial settlement agreement provided that Graf would discharge her attachment of the Torcia’s liquor license and if Graf was successful in the declaratory judgment action, Hospitality would pay Graf the damages as though the attachment were still in effect.
Hospitality removed Grafs suit to the United States District Court and also moved to dismiss it insisting it could not be held liable for the cost of the bond because the $500,000 damages award had independently triggered the Policy’s coverage limit, and that because the requested bond was sought to discharge an attachment for an amount of prejudgment interest in excess of the $500,000 limit, which had been reached, the bond amount, le., $115,000.00, was not within the applicable limit of insurance.
On July 26, 2013, the District Court agreed with Hospitality’s interpretation of the Policy and granted Hospitality’s motion to dismiss. See Grqfv. Hospitality Mut Ins. Co., 956 F.Sup.2d 337 (D.Mass. 2013) (Nie-man, M.J.). Graf appealed. On June 11, 2014, the First Circuit affirmed, stating:
We agree with the magistrate judge that the Policy is susceptible to just one reasonable interpretation. The Policy contains a “Supplementary Payments” provision; Section 1(C)(2) unambiguously obligates Hospitality to pay for the cost of certain bonds, but only insofar as those bonds are for amounts within the applicable limit of insurance. (Emphasis added.) Here, the limit of insurance was reached by virtue of the $500,000 damages award, and the Policy did not obligate Hospitality to pay for the cost of a bond covering a prejudgment interest award beyond that amount. [Note 3] Graf s arguments to the contrary may be quickly dispatched.
Graf v. Hospitality Mut. Ins. Co., 754 F.3d 74, 77 (1st Cir. 2014) (emphasis supplied).
Having agreed with Hospitality that its policy did not cover the cost of the bond to release Grafs attachment of the insured’s liquor license, the Court went on at, footnote 3, to reject Grafs contention that Hospi *23 tality was obliged to cover the $115,000 prejudgment interest Grafs judgment had accrued:
To be sure, Hospitality’s obligation to pay “damages” includes awards of prejudgment interest, Policy HV(C), but only where those awards are within the Policy limit, id. at 11(C)(2).
Id. (emphasis supplied).
The First Circuit was dismissive of Grafs argument that Hospitality’s policy required Hospitality to pay for the cost of a bond to release Grafs attachment on the liquor license because the amount of that bond, some $115,000, is itself within the $500,000 Policy limit, as an argument which—
. . . tortures . . . the plain meaning of the applicable [policy] terms . . . Section 1(C)(2) provides that Hospitality will pay with respect to any claim or “suit” [it] defend[s]: . . . [t]he cost of bonds to release attachments, but only for bond amounts within the applicable limit of insurance . . . [Grafs argument] makes no sense and cannot be squared with the plain language of the Policy.
Gref, 754 F.3d at 77-78 (emphasis added).
CONCLUSIONS AND RULINGS OF LAW
(a) Hospitality’s Responsibilities Under c. 176D
The law in regard to an insurer’s obligation to settle liability claims is well established in Massachusetts. G.L.c. 93A, §2(a) states that “unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.” G.L.c. 176D, §3, in turn, prohibits “unfair or deceptive acts or practices in the business of insurance, including, in subsection 9(f), the failure ”to effect prompt, fair and equitable settlements of claims in which liability has become reasonably clear."
The Supreme Judicial Court has declared that “the former statute incorporates the latter” and, therefore, an insurer that fails “to effectuate a prompt, fair and equitable settlement of claims in which liability has become reasonably clear, by definition, has violated the prohibitions in [c. 93A] against the commission of unfair or deceptive acts or practices.” Bobick v. U.S. Fidelity & Guaranty Trust, 439 Mass. 652, 659 (2003) (quotations omitted). Taken together, c. 93A and c. 176D “require an insurer . . . promptly to put a fair and reasonable offer on the table when liability and damages become clear, either within the thirty-day period set forth in G.L.c. 93A, §9(3), or as soon thereafter as liability and damages make themselves apparent.” Hopkins v. Liberty Mutual Ins. Co., 434 Mass. 556, 566 (2001); R.W. Granger & Sons v. J&S Insulation, 435 Mass. 66, 72-78 (2001).
The standard for determining the adequacy of an insurer’s response to a demand for relief under c. 93A is “whether, in the circumstances, and in light of the complainant’s demands, the offer is reasonable.” Clegg v. Butler, 424 Mass. 413, 420 (1997). Accord Bobick, 439 Mass. at 659.
Given that Hospitality did not believe that its insureds’ liability for Grafs injuries was reasonably clear, either at or following the time when Grafs c. 93A demand letter was served upon Hospitality, I must consider the other circumstances contextualizing its settlement position. It is, of course, well established that the relevant inquiiy in this regard is whether the insurer reasonably believed that its insured’s liability with respect to damages was not clear. See O’Leary-Alison v. Metropolitan Prop. & Cas. Ins. Co., 52 Mass.App.Ct. 214, 217 (2001); Bolden v. O’Connor Café of Worcester, 50 Mass.App.Ct. 56, 66-67 (2000). Speaking of context, the Supreme Judicial Court has explained that “the reasonableness of an insurer’s response is to be considered in the light of the situation as a whole.” Bobick, 439 Mass, at 662. “Negotiating a settlement, particularly when the damages are unliq-uidated, is, to an extent, a legitimate bargaining process. The statute [G.L.c. 176D, §3(9)] does not call for a defendant’s final offer, and experienced negotiators do not expect it or take seriously a representation that it is.” Forucci v. U.S. Fiduciary & Guaranty Co., 1 F.3d 1, 2 (1st Cir. 1993). All the law requires is that an insurer extend a reasonable offer of settlement—and thereby participate in good faith in the bargaining process—once the matter of liability and damages has become clear to it. Bobick, id. at 662; Parker v. D'Avolio, 40 Mass.App.Ct. 394, 395 (1996) (“The defendants bore the burden of proof that their settlement offer was reasonable and made in good faith in light of the demand and attendant circumstances”).
Several decisions have established an insurer has the burden to prove that its settlement offer was reasonable, and a plaintiff need not prove that she would have accepted a reasonable offer, had one been made. “An insurer’s statutory duty to make a prompt and fair settlement offer does not depend on the willingness of a claimant to accept such an offer . . . Accordingly, quantifying the damages . . . does not turn on whether the plaintiff can show that she would have taken advantage of an earlier settlement opportunity.” (Citation omitted.) Hopkins v. Liberty Mut. Ins. Co., 434 Mass. at 567. See Bobick v. United States Fid. & Guar. Co., 439 Mass. at 662-63 (“The judge’s . . . decision was based, in part, on the plaintiffs failure to demonstrate that he would have been willing to accept a reasonable settlement offer at any time before trial. This is incorrect”); Rhodes v. AIG Domestic Claims, Inc., 461 Mass. 486, 495 (2012).
(b) Hospitality’s Pre-Verdict Assessment of its Insured’s Liability
Hospitality has met its burden of proof that both before and during the trial, it reasonably determined that the liability of its insured was not reasonably clear. Put simply, Graf had her own version of what happened in the bar, and the Fat Cat Bar staff had its. The two versions were plausible yet irreconcilable. Hospitality was not required to assume the truth of *24 Grafs version, nor was Hospitably bound to assume the juiy would do so either. There is no evidence that Hospitabty failed to dutifully investigate the claim, or that its trial counsel Sheehan did not conduct discovery in a thoughtful, inquiring, dibgent and balanced manner.
Given the contradictory accounts of how Graf became injured, it is unsurprising that Sheehan’s pretrial assessment was that there was a 50% chance Graf would not prevail. Because Hospitality sincerely, reasonably and legitimately viewed Grafs claim against its insureds’ as a “toss of the coin,” liability was then not reasonably clear. In light of Hospitality’s pre-verdict liability assessment, which I find was arrived at reasonably, I credit as sincere Sheehan’s “stunned” reaction to the jury verdict, particularly with regard to the $500,000 damages assessed. Grafs injuries, though serious, were hardly within the realm of devastating or catastrophic. And it is revealing that her able and dibgent opposing counsel Albano—who throughout has claimed liability was clearly established—valued Grafs claim at $300,000, which he later reduced to $130,000 just before trial—considerably lower than the amount of the verdict. Thus, Hospitably had good reasons to be skeptical that ajuiy would value Grafs damages so highly.
Liability is not reasonably clear where a tort defendant possesses a valid defense. As long as an insurer has a plausible legal or factual position, even one that ultimately turns out to be mistaken or unsuccessful, the insurer’s actions in as-sessing the claim do not violate G.L.c. 93A or G.L.c. 176D. See Bolden v. O’Connor Café of Worcester, Inc., supra at 66-67 (“what matters in the G.L.c. 93A case is whether [the insurer] reasonably believed that [the insured’s] liability was not clear or was unreasonable in holding that belief’); See also Guity v. Commerce Ins. Co., 36 Mass.App.Ct. 339 (1992) (as long as an insurer has a plausible legal or factual position, even one that ultimately turns out to be mistaken or unsuccessful, the insurer’s actions in assessing the claim do not violate G.L.c. 93A or G.L.c. 176D); Dimeo v. State Farm Ins. Co., 38 Mass.App.Ct. 955 (1995) (where insured driver’s liability was not reasonably clear, insurer’s refusal to settle was not an unfair claim settlement practice proscribed by G.L.c. 176D and accordingly, there was no liability under G.L.c. 93A); O'Leary-Alison v. Metropolitan Prop. & Cas. Ins. Co., 52 Mass.App.Ct. at 217 (affirming trial judge’s determination that the insurer’s offers of settlement were reasonable and made in good faith and that the insurer had multiple reasons to be skeptical of the injured party’s damage claims); Clegg v. Butler, 424 Mass. at 421 (where the term “liability” in the context of c. 176D §3(9) (f) “encompasses both fault and damages . . . [o]ur decisions ... in no way penalize insurers who delay in good faith when babihty is not clear and requires further investigation”).
“So long as the insurer acts in good faith, the insurer is not held to standards of omniscience or perfection; it has leeway to use, and should consistently employ, its honest business judgment.” Bolden v. O’Connor Café of Worcester, Inc., supra at 67, quoting Peckham v. Continental Cas. Ins. Co., 895 F.2d 830, 835 (1st Cir. 1990).
It is the reasonableness of Hospitably’s (rather than Grafs) beliefs which defines the statutory test. Even a very significant under-valuing of a plaintiffs claim will not trigger liability under c. 176D or c. 93A absent evidence that the insurer “acted deliberately to derail the settlement process.” Parker v. D’Avolio, supra at 395 (defendant’s offer of $25.00 to plaintiff who subsequently obtained verdict of $ 1,250,000.00 held to be in good faith and not a violation of Chapter 93A). See also O’Leary-Alison, 52 Mass.App.Ct. at 218 (given the “equivocal medical evidence” supporting plaintiffs claim, “it was not error for the judge to conclude that [the insurer’s] offers of settlement were reasonable and made in good faith”— this despite the fact that the insurer offered just $20,000 on a claim where the jury awarded $125,000).
Again, because of the irreconcilable fact scenarios revealed in its investigation and in discoveiy, Hospitably reasonably determined that the liability of its insureds pre-verdict was not reasonably clear. Hospitality had no duty under c. 176D to make a settlement offer before the jury rendered their verdict.
(c) Hospitality’s Post-Verdict Assessment of its Insured’s Liability
Graf submits that when the jury returned their $500,000 verdict in her favor, certainly liability was then reasonably clear, thereby triggering Hospitality’s duty under c. 176D to make a reasonable offer of settlement. Hospitably disagrees because its counsel advised Hos-pitabty that its insureds did not get a fair trial. Specifically, Hospitably submits c. 176D did not preclude its good faith pursuit of a new trial with a post-trial motion and an appeal because its experienced and able co-counsel advised Hospitabty the trial judge committed reversible error when he wrongfully excluded from the jury’s consideration Fat Cat manager Gauthier’s explanation for not calbng an ambulance for the injured Graf, namely, the pobce officer’s statement to Gauthier that there was “nothing” she could do once Graf declined an ambulance. Thus, Hospitabty submits it had a good faith basis for seeking a new trial because the unrebutted consciousness of guilt evidence—Fat Cat’s failure to call Graf an ambulance—likely inflamed the jury’s passions and sympathies toward Graf on the critical issues of credibibty.
Sheehan, having preserved the issue at trial, was in a solid position to argue on appeal that the excluded pobce officer’s statement to Gauthier was not hearsay because the officer’s statement was not offered for its truth. “An extrajudicial statement is not hearsay when offered to prove that the person to whom it was addressed had notice or knowledge of the contents of the statement.” Brodin & Avery. Massachusetts Evidence (8th ed.), §8.2.2. See also, Pardo v. General *25 Hosp. Corp., 446 Mass. 1, 18 (2006) (memorandum and letter "written by third parties and read by supervisor admissible to show state of mind of supervisor to explain actions he took regarding Plaintiff in employment discrimination action); Commonwealth v. Torres, 442 Mass. 554 (2004) (statement by police officer to Defendant admissible to explain why Defendant accused child’s mother of abuse of children). See also, Commonwealth v. Miller, 361 Mass. 644, 659 (1972) (out-of-court statements are admissible when offered to explain why the police approached the defendant and to avoid the impression that the police acted arbitrarily in singling out the defendant).
There is authority that the police officer’s out-of-court statement to the manager was admissible as state of mind evidence to rebut Grafs post-accident evidence that the Fat Cat elected not to call her an ambulance which Albano successfully convinced the judge to admit as consciousness of liability evidence. Once a party introduces state of mind evidence to prove part of that party’s case, the opposing party has an absolute right to negate that evidence. Commonwealth v. Chase, 26 Mass.App.Ct. 578, 580-81 (1988) (holding that “defendant had an unqualified right to negate the inference of consciousness of guilt by explaining to the jury” why he took the action in question); Commonwealth v. Goldberg, 212 Mass. 88, 91 (1912) (“[I]t was competent for them to show, if they could, that the reason for their avoidance was not a consciousness of guilt, but . . . some other cause consistent with their innocence, and to show what the cause was. This was in substance what they offered to prove, and they should have been allowed to do so”).[11]
Notwithstanding these authorities favoring admissibility of the excluded evidence, a trial judge is afforded considerable discretion on such evidentiary matters, particularly where the judge deems that the probative value of otherwise admissible evidence is outweighed by its prejudicial effect.[12] See Massachusetts Guide to Evidence, §403. Excluding Relevant Evidence for Prejudice, Confusion, Waste of Time, or Other Reasons.[13] Even if an appellate court were to agree that the police officer’s statement to Gauthier was not inadmissible hearsay, Graf argues Hospitality should have realized that an appellate court would likely deem the error not prejudicial and therefore harmless.[14]
Hospitality, of course disagrees. “The erroneous exclusion of relevant evidence is reversible error unless, on the record, the appellate court can say with substantial confidence that the error would not have made a material difference.” Brusard v. O’Toole, 45 Mass.App.Ct. 288, 292 (1998), quoting Dejesus v. Yogel, 404 Mass. 44, 48-49 (1989). In applying this standard, the appellate court will “view the record in a commonsense way, id. at 48, and [will] look to see if the excluded evidence was noncumulative and bore directly on one of the essential issues in the plaintiffs’ case.” Sacco v. Roupenian, 409 Mass. 25, 31 (1990). See also Fyffe v. Massachusetts Bay Transportation Authority, 86 Mass.App.Ct. 457, 474-75 (2014) (finding prejudicial error and awarding defendant a new trial. . . plaintiffs trial counsel’s numerous inflammatory remarks and efforts to inject facts beyond the record into the trial. . . and thus deprived the defendants of a fair trial," citing Dejesus v. Yogel, 404 Mass. 44, 48 (1989)).
In the criminal context, Massachusetts appellate courts have held that improperly admitting consciousness of guilt evidence, by itself, can sufficiently prejudice aparty as to require anew trial. See, e.g., Commonwealth v. Irwin, 72 Mass.App.Ct. 643, 655-56 (2008) (holding that evidence of defendant’s failure to contact and participate in an interview with a detective was impermissi-bly admitted, and ordering a new trial due to uncertainty as to whether the error had substantially swayed the outcome of the case); LePage v. Bumila, 407 Mass. 163 (1990) (holding that evidence of defendant’s payment of a fine without appeal on grounds that it constituted an admission of guilt was improperly admitted and prejudiced defendant’s case, requiring a new trial).
Here, there is no sound basis for me to conclude that Hospitality—advised as it was by reputable counsel—believed the claimed evidentiary error was harmless. See, e.g., De Jesus v. Yogel, supra (in an action for a landlord’s negligence, where plaintiff mother took a child to a friend’s apartment where the child fell off the railing, the trial judge wrongly excluded evidence that the railing had been loose two months before the accident requiring a new trial); Peterson v. Foley, 77 Mass.App.Ct. 348 (2010) (trial judge significantly erred in permitting police officer to give an opinion of fault in a motor vehicle accident, as it touched the ultimate issue, which was within the jury’s exclusive province. Because the plaintiff sustained injury to his substantial rights, a new trial was necessary).
Therefore, I conclude that Hospitality did not violate c. 176D by pursuing its post-trial motion to the trial judge seeking a new trial. Ross v. Continental Resources, Inc., 73 Mass.App.Ct. 497, 507 (2009) (“We think it self-evident that filing a timely motion of arguable merit to obtain relief from judgment imposing significant adverse consequences is not an act G.L.c. 93A prohibits”) (reversing an award of attorney fees as a sanction under c. 93A).
Neither did Hospitality violate c. 176D by seeking a new trial with the Appeals Court. In considering whether a decision by an insurer to take an appeal of a judgment against its insured may constitute a violation of c. 93A, “a plaintiffs jury verdict does not automatically make liability reasonably clear.” Resendes v. Boston Edison Co., Superior Court No. No. 970303T-BLS, 2000 WL421004 *940 (Mass.Super.Ct. Mar. 20, 2000) (van Gestel, J.). “If ‘an insurance company relies on the diligent, good faith evaluation of the case, by its counsel, this may be considered some evidence of good faith.’ ” Hartford Casualty Ins. Co. v. New Hampshire Ins. Co., 417 Mass. 115, 221 n.5 (1994); Boston Symphony Orchestra v. Commercial *26 Union Ins. Co., 406 Mass. 7, 14 (1989); see also, Resendes v. Boston Edison Co., Superior Court No. No. 970303T-BLS, 2000 WL 421004 *12 (Mass.Super.Ct. Mar. 20, 2000) (van Gestel, J.) (where insurer obtained an opinion from “a well-respected attorney with a substanial appellate practice in matters of insurance claims processing,” that there was a “strong argument” to present on appeal, it precluded a finding of bad faith based on the insurer’s refusal to make a settlement offer). It is only where “an appeal following an adverse jury verdict is wholly frivolous or interposed solely for delay in an effort to wear down the plaintiff, then, in the first instance, there is objective bad faith, and in the second, there is subjective bad faith. Violations of G.L.c. 93A/176D arise in either instance.” Resendes, 2000 WL 421004 at *10.
Indeed, on these facts, given Grafs persistent demand that (1) Hospitality pay an amount in excess of its policy limits, and her refusal to release Hospitality’s insureds until Graf signed the October 28 Agreement of Partial Settlement and Assignment, I conclude Hospitality believed in good faith that it was required to perfect and pursue its appeal as part of its duty to defend under its policy. “(T]he estab-lished rule is that an insurer’s duty to defend generally encompasses an obligation to appeal from an adverse judgment against its insured, but only if reasonable grounds exist to believe that the insured’s interests might be served by the appeal.” Davis v. Allstate Insurance Co., 434 Mass. 174, 180 (2001). See also Allison v. Metropolitan Prop. & Casualty Ins. Co., 1996 WL 34366634 (Mass.Super.Ct. June 4, 1996) [5 Mass. L. Rptr. 331] (finding no violation of G.L.c. 93Aor c. 176D even though the District Court’s decision awarding damages in the underlying tort case was appealed). “(A]n insurer can reasonably believe that a trial court’s award of damages is excessive and may, after consideration of the District Court decision and all other attendant circumstances, make an honest business judgment that an appeal is appropriate.” Id.
(d) The Effect of Hospitality’s Failure to Formally put an Offer on the Table After the Trial Judge Denied the Motion for New Trial
But the inquiry does not there end. Hospitality did not on the advice of counsel decline to make a post-verdict settlement offer. The evidence is otherwise. Sheehan, at Hospitality’s direction, aggressively explored settlement with Albano soon after the verdict. Thereafter, Ryan advised Hospitality to follow a “two-track” course of action, one of which was to settle Grafs tort claim. In fact, Ryan mistakenly believed that, after the verdict, Hospitality had in fact offered its policy limits in exchange for a release of its insureds, and that Graf had rejected the offer.
Acting on both Sheehan’s and Ryan’s advice Hospitality made significant efforts to settle Graf s claims while it perfected and pursued its appeal. Hospitality took these steps in pursuit of settlement because Hospitality concluded liability was reasonably clear once the post-trial motions were denied. If Hospitality did not so conclude, it should have. At that point, despite its good faith pursuit of an appeal, Hospitality realized the appeal was likely not to succeed based on Ryan’s advice that appeals in civil cases, in general, can be expected to succeed in just 20% of cases. Hospitality was then (upon the trial judge’s denial of the request for a new trial) bound under c. 176D to make a reasonable offer of settlement.
It is true that until Ryan’s July 16, 2010 letter to Albano, Hospitality never formally put an offer of its policy limits on the table. Nevertheless, I conclude that Hospitality did not violate c. 176D because I find, through Sheehan, Hospitality made the functional equivalent of an offer of its policy limits. Based upon the dealing of the parties, where appropriate, courts will recognize the concept of “functional equivalence” where the formal elements of agreements or offers are lacking. See e.g., Ward v. Costello, 2000 Mass.Super. LEXIS 320, 14-15 (Mass.Super.Ct. Aug. 3, 2000) (Sosman, J.) (“Costello contends that, by its wording, the written agreements he had with Ward were in fact mere ‘option’ agreements and that they did not constitute actual ‘offers.’ Costello is technically correct, although it is undeniable that the consequences of not exercising his ‘option’ were identical to the consequences a buyer would face if he had signed a standard ‘Offer to Purchase Real Estate’ and then backed out of the deal—. . . It was, in its actual operation and consequences, the functional equivalent of an ‘offer,’ even though it did not bind Costello to anything more than the loss of his deposit/’option payments’ in the event that he did not sign a purchase and sale agreement”) (emphasis supplied).[15] On March 5, just days after the trial judge denied Sheehan’s post-trial motion for a new trial, Sheehan called Albano and advised that Hospitality had directed her to inquire of Albano whether Graf would be open to settling the case for the policy limits. Albano surely understood Sheehan as communicating Hospitality’s willingness to pay Graf its policy limits. No evidence was before me to the contrary.
Grafs unwillingness to respond, through Albano, that she would accept Hospitality’s policy limits in settlement was not due to Grafs unwillingness, in concept, to accept Hospitality’s policy limits. Rather, it was due entirely to a good faith disagreement between Albano and Hospitality over what constituted Hospitality’s policy limits. Settlement was not achieved in the immediate aftermath of the verdict only because it was Albano’s good faith view that under Hospitality’s policy Graf was entitled to the full judgment with prejudgment interest, costs and postjudgment interest to the date of payment. Sheehan disagreed, telling Albano that $500,000.00 plus postjudgment interest to date constituted Hospitality’s full policy limits, a view later confirmed by the First Circuit when Graf fully litigated the point in Graf v. Hospitality Mut Ins. Co., 754 F.3d 74, 77 (1st Cir. 2014).
*27 Sheehan’s inquiries in March and thereafter whether or not Grafs would accept Hospitality’s policy limits were not settlement offers in the formal sense. But after the verdict and the judge’s denial of the post-trial motion for new trial, Albano never doubted that Hospitality would pay its full policy limits, as defined to him by Sheehan. Hospitality did not “derail the settlement process,” Parker v. D’Avolio, supra at 395, by failing to convert its inquiries whether Graf would accept its policy limits into a formal policy limits offer.
Plainly, Albano was neither posturing nor negotiating when beginning on March 5, and thereafter, he made clear to Sheehan that Graf would not accept Hospitality’s policy limits as they were being (correctly, as it turned out) defined by Sheehan. That this was not a mere settlement tactic was confirmed by Albano’s later rejection of Hospitality’s policy limits when formally offered by Ryan in the latter’s July 16, 2010 letter to Albano. This was zealous advocacy by Albano on behalf of Graf, and rather than compromise, he was determined to see the issue through to the conclusion of declaratoiy judgment litigation and appeal.
Thus, although not a necessary basis for my decision, I conclude that Graf, acting on Albano’s advice, would not have accepted any formal offer of Hospitality's policy limits any earlier than she did when she signed the October 28 Agreement of Partial Settlement, even if one had been put on the table because (1) Albano was fully aware that Hospitality’s policy limits (as defined for him by Sheehan) were there for Grafs taking but he made crystal clear his client had no interest in accepting any such offer, and (2) when Hospitality did extend a formal offer of its policy limits on July 16, Albano rejected the offer. “If a claimant with a claim in excess of the policy limit will not settle all claims against the insured that are covered by the policy, a company does not violate clause (f) by refusing to pay the policy limit.” Lazaris v. Metropolitan Property & Casualty Co., 428 Mass. 502, 505 (1998).
After the verdict and the judge’s denial of a new trial, Hospitality did not fail to effectuate a prompt, fair and equitable settlement of Grafs claim. Hospitality did not fail or refuse to participate in good faith in the bargaining process toward settlement. Hospitality never tried to settle the case for less than its policy limits, nor was that ever its intent or goal. Neither did Hospitaliiy then refuse to make a settlement offer.
In sum, Hospitality acted in good faith to advance rather than derail the settlement process. It is significant that it was the persistence and flexibility of Hospitality, acting through Ryan and Sheehan, which ultimately yielded the October 28 partial settlement whereby Graf finally agreed to accept Hospitality’s policy limits so long as she was free to separately litigate the definition of the extent of the policy limits. Far from acting “deliberately to derail the settlement process,” Parker v. D’Avolio, 40 Mass.App.Ct. at 395, Hospitality, rather than Graf, provided the catalyst for the settlement.
On these facts, to hold Hospitality in violation of c. 176D would exalt form over substance. Liquor Liab. Joint Underwriting Ass’n of Mass. v. Great Am. Ins. Co., 16 Mass. L. Rptr. 268 (Mass.Super.Ct. 2003) (Hines, J.) (“The courts routinely look beyond form to substance where a party seeks a remedy under G.L.c. 93A for injury caused by the alleged unfair or deceptive acts or practices of another party not generally assumed to operate in a business context,” citing Lafayette Place Assocs. v. Boston Redevelopment Auth., 427 Mass. 509 (1998) (quoting Judge Leval in Teachers Ins. Annuity Ass’n v. Tribune Co., 670 F.Sup. 491, 497-98 (S.D.N.Y. 1987): “Notwithstanding the importance of protecting negotiating parties from involuntary judicially imposed contract, it is equally important that courts enforce and preserve agreements that were intended as binding, despite a need for further documentation or further negotiation. It is, of course, the aim of contract law to gratify, not to defeat, expectations that arise out of intended contractual agreement, despite informality or the need for further proceedings between the parties”)).
ORDER
For all of the above reasons, I find in favor of defendant Hospitality Mutual Insurance Company and against plaintiff Katie Graf on her claims under G.L.c. 93A. Judgment shall enter in favor of defendant.

 Graf v. Torcia & Sons, Inc. d/b/a The Fat Cat Bar & Grill and Ronald Lindsey, Hampden County Superior Court, C.A. No. 2008-00338.

 George was employed by Hospitality from 2003 to 2012. She worked in claims for Commercial Union for 20 years before working for Hospitality. She earned a Chartered Property and Casualty Underwriter designation in 1996, and had taught liability claims classes for the Insurance Institute of America.

Marchant was Hospitality’s Vice President of Claims from January 2005 (LLJUA at that time) until he retired in November 2011. George and he were Hospitality’s only two Claims Department employees during the 2007 through 2010 period. Marchant reported directly to Hospitality’s President, John Tympanick. Marchant had worked as a füll-time claims professional since 1974. Before joining LLJUA in 2005 Marchant had been the Vice President of Southern New England Claims for One Beacon/CGU/Commercial Union insurance companies.

 See Brown v. Sewell, 14 Mass.App.Ct. 970 (1982) (‘The judge was in the best position to evaluate the demeanor and motives of the plaintiff, and we think that his finding cannot be said to lack the support of clear and convincing evidence”): Commonwealth v. Brescia, 471 Mass. 381, 387 (2015) (“[T]he trial judge instructed the jury, consistent with the model jury instructions, that a witness’s demeanor on the stand is a factor relevant to assessing his or her credibility”).

 Sheehan [and later Ryan] advised Hospitality that the combination of these rulings were highly prejudicial to defendants, warranting a new trial.

 The trial judge’s Memorandum and Order did not address Attorney Sheehan’s argument regarding the exclusion of Gauthier’s state of mind evidence regarding what she was told by the Springfield Police and the unqualified right of a party to negate an inference of consciousness of guilt.

 Albano made this same argument and demand in an April 21, 2010 letter to Hospitality.

 In his Finding and Order of Approval of Attachment of Liquor License, the trial judge expressly found that “that there is a reasonable likelihood that [Graf] will recover judgment, including interest and costs, in an amount equal to or greater than the amount of the attachment approved herein over and above any liability insurance shown by the [Fat Cat] to be available to satisfy the judgment.”

 It was Ryan’s incorrect understanding that after the verdict, the policy limits plus postjudgment interest had been offered by Hospitality to Albano. At trial, and earlier in his deposition, Ryan agreed he was wrong, and that Sheehan had only communicated Hospitality’s “willingness” to pay the policy limits and the accrued postjudgment interest. Ryan agrees that technically this “was not an actual offer” of the policy limits and interest.

 Grafs tort suit settled before Graf was required to file her brief.

 See Massachusetts Guide to Evidence, §1110. Consciousness of Guilt or Liability . . .
(b) Civil Cases. “. . . [I]n a civil case, a party may offer evidence of another party’s conduct that occurred subsequent to the commission of the alleged act or acts that give rise to the cause of action if the evidence (1) reflects a state of consciousness of liability of that party; (2) supports the inference that the party against whom the evidence is offered is liable; and (3) is, with other evidence, together with reasonable inferences, sufficient to prove liability.
Evidence of consciousness of liability alone cannot sustain the burden to establish liability. The judge should instruct the jury accordingly.
(c) Rebutted. The party against whom the evidence is offered has the right to offer evidence explaining the reason or reasons for the conduct to negate any adverse inference. (emphasis supplied).

 It is worth noting that in L.L. v. Commonwealth, 470 Mass. 169, 185 n.27 (2014), the Supreme Judicial Court recalibrated the standard of review for an abuse of discretion appeal making reversals less challenging:
An appellate court’s review of a trial judge’s decision for abuse of discretion must give great deference to the judge’s exercise of discretion; it is plainly not an abuse of discretion simply because a reviewing court would have reached a different result But the “no conscientious judge” standard is so deferential that, if actually applied, an abuse of discretion would be as rare as flying pigs. When an appellate court concludes that a judge abused his or her discretion, the court is not, in fact, finding that the judge was not conscientious or, for that matter, not intelligent or honest Borrowing from other courts, we think it more accurate to say that a judge’s discretionary decision constitutes an abuse of discretion where we conclude the judge made “a clear error of judgment in weighing” the factors relevant to the decision, such that the decision falls outside the range of reasonable alternatives.

Id.

 The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence.”

 See Mass.RCiv.P. 61. Harmless Error. “No errorin either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.”
See also, G.L.c. 231, §119: “Harmless Error. No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or anything done or omitted by the trial court or by any of the parties is ground for modifying or otherwise disturbing a judgment or order unless the appeals court or the supreme judicial court deems that the error complained of has injuriously affected the substantial rights of the parties. If either court finds that the error complained of affects only one or some of the issues or parties involved it may affirm the judgment as to those issues or parties unaffected and may modify or reverse the judgment as to those affected.”

 See also Adoption of Vidal 56 Mass.App.Ct 916 (2002) (“An assessment completed by one employed by an organization under contract with DSS is the functional equivalent of an assessment undertaken by a person employed directly by DSS”); Brasi Dev. Corp. v. AG, 456 Mass. 684, 694 (2010) (‘The judge decided that the lease agreement between Brasi and the university was not 'the functional equivalent of a construction contract’ because Brasi retained ownership of the land and the building, assumed the risks and costs of construction, and assumed also the costs of ownership of the finished dormitory”); Campbell v. Gen. Dynamics Gov’t Sys. Corp., 407 F.3d 546, 559 (1st Cir. Mass. 2005) (“If a reasonable employee of General Dynamics would have known, given prior dealings between the company and its work force, that personnel handbooks operated as the functional equivalents of contracts, the introduction of a new policy and the fact of its promulgation in a reissued handbook might have sufficed to alert such an employee that the handbook contained legally binding terms’’); Frazier v. Bailey, 957 F.2d 920, 928 (1st Cir. Mass. 1992) (“We hold, therefore, that individuals . . . under contract with the government, are entitled to raise a qualified immunity defense because they are the functional equivalent of public officials”); Rodi v. Ventetuolo, 941 F.2d 22, 28 (1st Cir. RI. 1991) (“[C]onsent decrees have traditionally been considered the functional equivalent of contracts . . .”); Greg Beeche Logistics, LLC v. Skanska USA Bldg., Inc., 2014 U.S.Dist. LEXIS 146931 (D.Mass. May 19, 2014) (holding that the functional equivalent of privity’ may be established despite lack of a formal contract" . . . “New York law does recognize that, even in the absence of a formal signed contract, the ‘functional equivalent of privity’ may exist in construction situations under certain circumstances when a project owner and subcontractor engage in direct dealings”). See also New York Cent. Mut. Fire Ins. Co. v. Farm Family Mut. Ins. Co., 231 A.D.2d 722, 723 (N.Y.App.Div.2d Dep’t 1996) (high/low arbitration proceeding entered into between Farm Family and Ms. Wagner was the “Junctional equivalent of a settlement’); Cinergy Corp. v. St. Paul Surplus Lines Ins. Co., 785 N.E.2d 586, 593 (Ind.Ct.App. 2003) (case management order was the product of an agreement between the parties, we viewed the order as the “functional equivalent’ of a settlement agreement, “in the nature of a contract,” sanctioned by court order, citing Travelers Indem. Co. v. P.R. Mallory & Co., 772 N.E.2d 479 (Ind.Ct.App. 2002)); Siltronic Corp. v. Emplrs Ins. Co. of Wausau, 921 F.Sup.2d 1099, 1107 (D.Or. 2013) (“payment of funds for costs of complying with a consent decree is the functional equivalent of a settlement’); Cweklinsky v. Mobil Chem Co., 364 F.3d 68,78 (2d Cir. Conn. 2004) (“a promise need not be the functional equivalent of an offer to enter into a contract,” quoting Stewart v. Cendant Mobility Services Corp., 837 A.2d at 745); United States v. Conklan, 41 M.J. 800, 803 (A.C.C.A. 1995) (“official may make the functional equivalent of an offer of immunity when he manifests apparent authority to grant immunity” which if relied on may result in “de facto” grant of immunity).